[No. 45156. En Banc. October 19, 1978.]

NORTHEND CINEMA, INC., ET AL, *Appellants*, v. THE
CITY OF SEATTLE, *Respondent*.

*Victor V. Hoff,* for appellants Northend Cinema, et al.

*Charles Stixrud,* for appellant Apple Theater.

*John P. Harris, Corporation Counsel,* and *Dona Cloud, Assistant,* for respondent.

HOROWITZ, J.—The issues raised here involve the validity of two Seattle city zoning ordinances which have the effect of requiring all adult motion picture theaters as defined in the ordinances, to be located in certain downtown areas, and terminating all nonconforming theater uses within 90 days. The three Seattle theaters prohibited from showing their normal adult fare at their present locations by these ordinances challenge the constitutionality of the zoning enactments in this declaratory judgment action. The court

below heard extensive testimony at trial and upheld the validity of the City's action. We affirm.

The amendments to the City's zoning code which are at issue here are the culmination of a long period of study and discussion of the problems of adult movie theaters in residential areas of the City. Following local resident protests against the opening of such a theater in the Greenwood district, the City's Department of Community Development made a study of the need for zoning controls of adult theaters at the request of both the City Planning Committee and the City Council Committee on Planning and Urban Development. The study analyzed the City's zoning scheme, comprehensive plan, and land uses around existing adult motion picture theaters. Of the 46 motion picture theaters operating within the City, 13 showed adult motion pictures exclusively, or almost exclusively. Ten of those 13 were located in downtown areas where such uses are now permitted by the challenged ordinances. The other three, the Ridgemont, the Northend, and the Apple Theater, are in areas outside the designated zones which are characterized by residential uses. These three theaters show "x-rated" films almost exclusively and display advertisements indicating the nature of the films on the theater marquees or fronts.[1] The Department's study concluded that zoning action should be taken to confine adult motion picture theaters to downtown Seattle, and recommended that a conditional use approach be adopted for adult theaters in other areas.

The Department's study and recommendation were taken up by the City Planning Commission, which held

---

[1]The trial court found: Films rated "X" are identified in the Code of Self Regulation of the Motion Picture Association of America as "pictures submitted to the Code and Rating Administration which . . . are rated X because of the treatment of sex, violence, crime or profanity."

The advertisements generated by these theaters and the displays on their marquees and fronts indicate the film fare therein is sexually explicit and exploits a market for the shocking and bizarre sexual experience. The films are one sequence of explicit sexual activity after another, almost completely uninterrupted by any plot.

public meetings and a joint public hearing with the City Council Committee on the subject. At the public hearing Greenwood residents spoke of their concerns regarding the deterioration of residential neighborhoods that accompanies location of adult movie theaters. The concerns expressed were very specific and included the attraction of transients, parking and traffic problems, increased crime, decreasing property values, and interference with parental responsibilities for children. The Planning Commission subsequently voted to recommend that the City zoning code be amended to confine adult theaters to downtown areas and phase out nonconforming uses. The Commission opposed any conditional use plan for other zones.

The neighborhoods in which the three appellant theaters are located have a distinctly residential character. Much effort and money have been invested in long–range improvement plans for these areas. The Greenwood community, in which the Northend and Ridgemont are located, has been the subject of major development plans for years. Millions of dollars of development funds have been invested to improve the quality and conditions of the community. Ongoing projects include improved sidewalks, lighting, and traffic control, and a new shopping mall. The First Hill Community, in which the Apple Theater is located, has not been the subject of such elaborate development plans, but has received substantial funds for neighborhood improvement and is designated a residential area in the City's long range plans. In short, the goal of the City in amending its zoning code was to preserve the character and quality of residential life in its neighborhoods, as specifically found by the court below. A second and related goal, the court found, was to protect neighborhood children from increased safety hazards, and offensive and dehumanizing influence created by location of adult movie theaters in residential areas. These goals are an integral part of the City's long–range land–use planning effort.

Thus in May and June of 1976 the Seattle City Council amended the zoning ordinance with ordinance No. 105565,

enacted on May 28 and effective on or about June 27, 1976, and ordinance No. 105584, enacted June 7 and effective on or about July 7, 1976. The combined effect of the ordinances is to create a land use known as Adult Motion Picture Theaters, to prohibit that use in all city zones except the CM (Metropolitan Commercial), BM (Metropolitan Business), and CMT (Temporary Metropolitan Commercial) zones, and to require termination of all nonconforming uses within 90 days of the date the use becomes nonconforming. The land area comprising the permitted zones is approximately 250 acres. No provision is made in the ordinances for conditional uses in other zones.

At the trial on appellant theaters' declaratory judgment action the court heard extensive testimony regarding the history and purpose of these ordinances.[2] It heard expert testimony on the adverse effects of the presence of adult motion picture theaters on neighborhood children and community improvement efforts. The court's detailed findings, which include a finding that the location of adult theaters has a harmful effect on the area and contribute to neighborhood blight, are supported by substantial evidence in the record. Its refusal to enter appellant Apple Theater's proposed findings was not error, as these were either unsupported by the record, or not related to ultimate facts concerning a material issue. *In re Kennedy,* 80 Wn.2d 222, 492 P.2d 1364 (1972).

The central question raised is whether, in view of these facts, the action of the City in creating the adult motion picture theater use and confining that use to certain zones within the downtown area is constitutional. A second question is whether the City may constitutionally impose a 90–day termination period on nonconforming uses. We answer

---

[2] In view of the extensive record developed at the trial of the City's planning studies, meetings and hearings, we find the City has fully sustained its burden of demonstrating the conditions and need for its zoning action. Appellant Apple Theater's objection to the record in this regard is unfounded. *See Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978). *See also Abbenhaus v. Yakima,* 89 Wn.2d 855, 576 P.2d 888 (1978).

both questions affirmatively, for the reasons discussed hereafter. We turn first to the constitutionality of the creation and confinement of the adult motion picture theater use.

## I

Appellants make three constitutional arguments against the Seattle zoning provisions. First, they claim the definition of an adult motion picture theater is so vague as to deny them due process of law. Second, they claim the confinement of such theaters to designated zones is an impermissible prior restraint on protected First Amendment speech. Third, they argue the classification of theaters based on the content of the films shown there violates First Amendment and equal protection guaranties.

In response to these contentions we find the decision of the United States Supreme Court in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976) (hereinafter referred to as *Young*) dispositive. In that case the court approved the creation and definition of an adult theater zoning use identical in all relevant respects to the Seattle zoning use. It also approved regulation of location for that use. Although appellants argue the Seattle ordinance differs from the Detroit ordinance, those differences do not have constitutional significance, as discussed below. We need not, of course, construe the provisions of our state constitution identically with the corresponding provisions of the federal constitution. *Darrin v. Gould,* 85 Wn.2d 859, 868, 540 P.2d 882 (1975). In this case, however, we find the reasoning of *Young* persuasive. It acknowledges and accommodates the important interest of the state in exercising its police power to protect city neighborhoods against degradation, while preserving the democratic principles the constitutional provisions were designed to protect. We therefore find it appropriate to apply the general rule that language in our state constitution will be given the same interpretation as that given the federal constitutional provision by the United States

Supreme Court. *See Housing Authority v. Saylors,* 87
Wn.2d 732, 739, 557 P.2d 321 (1976).

A. Vagueness

Appellants' first argument is that the definition of Adult
Motion Picture Theater (set out in the margin)[3] is so vague
as to deny them due process of law. They do not attack the
included definitions of "Specified Sexual Activities" or
"Specified Anatomical Areas," but argue they are not ade-
quately informed of (1) how much "depicting, describing,
or relating" to the specified areas is necessary before a film
is "distinguished or characterized by an emphasis" thereon;
(2) what "depicting, describing or relating to" means; or
(3) how frequently such films must be shown before a
building is "used" for the purpose.

We note at the outset that the definition of adult
theater use contained in the Seattle ordinance is identical
in all relevant respects to the definition upheld in *Young.*[4]
Furthermore, as in *Young,* the complaining theaters show
adult films almost exclusively. They do not claim they

---

[3]Ordinance No. 105565 Definition of Adult Motion Picture Theater
(§ 1)
"An enclosed building used for presenting motion picture films distinguished
or characterized by an emphasis on matter depicting, describing or relating to
'Specified Sexual Activities' or 'Specified Anatomical Areas', as hereinafter
defined, for observation by patrons therein:
"'Specified Sexual Activities'"
"1. Human genitals in a state of sexual stimulation or arousal;
"2. Acts of human masturbation, sexual intercourse or sodomy;
"3. Fondling or other erotic touching of human genitals, pubic region, buttock
or female breast.
"'Specified Anatomical Areas'"
"1. Less than completely and opaquely covered:
"(a) human genitals, pubic region, (b) buttock, and (c) female breast below a
point immediately above the top of the areola; and
"2. Human male genitals in a discernibly turgid state, even if completely and
opaquely covered."

[4]Adult Motion Picture Theater
"An enclosed building with a capacity of 50 or more persons used for present-
ing material distinguished or characterized by an emphasis on matter depicting,
describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical

desire to show any other type of film. Therefore, the ordinance is fully adequate to give them notice of the regulated use, and they have no standing to challenge it for vagueness. *Young, supra* at 59.

■ Nor do appellants have standing to assert the First Amendment rights of others and challenge the ordinance for facial overbreadth. The special rule giving standing to one whose own rights are not violated to challenge an ordinance for overbreadth applies only if the ordinance's deterrent effect on protected First Amendment speech is "both real and substantial" and the ordinance is not easily susceptible to a narrowing construction. *Erznoznik v. Jacksonville,* 422 U.S. 205, 216, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975). We are not persuaded those elements are present here. First, there is no evidence that the effect of this ordinance will be a substantial deterrence to protected First Amendment speech. It does not limit the total number of adult theaters which may operate in the City, or significantly inhibit viewers from gaining access to the films. The court below specifically found the ordinance does not have any significant deterrent effect on the exhibition or viewing of adult motion picture films.[5] Second, any language in the

---

Areas,' (as defined below) for observation by patrons therein.

"...

"For the purpose of this Section, 'Specified Sexual Activities' is defined as:

"1. Human Genitals in a state of sexual stimulation or

"2. Acts of human masturbation, sexual intercourse or sodomy.

"3. Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.

"And 'Specified Anatomical Areas' is defined as:

"1. Less than completely and opaquely covered: (a) human genitals, pubic region, (b) buttock, and (c) female breast below a point immediately above the top of the areola; and

"2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered."

[5]Since we hold the ordinance does not place a substantial burden on First Amendment speech, no presumption of unconstitutionality is raised. Appellants' argument the ordinance is presumptively invalid must therefore be rejected. Nor must the City choose the least restrictive alternative available to accomplish its purpose, as alleged by appellants, since there is no substantial burden on free speech.

ordinance which is uncertain is readily subject to a narrowing and constitutionally sound construction. These conclusions accord with those of the court in *Young* under substantially identical circumstances. Appellants' due process claim must therefore be dismissed for lack of standing.

## B. Prior Restraint

Appellants next argue the ordinance is an impermissible prior restraint on protected First Amendment speech because it prohibits the screening of nonobscene films (*i.e.*, protected speech) outside the designated zones.

As pointed out above, appellants make no showing that the market for distribution and exhibition of these films is in fact restrained under the ordinance. There was testimony at trial that adult movie theaters would easily be able to find a location in the designated zones. Furthermore, although potential viewers would be able to see the films only in those downtown areas, there is no evidence that this places any burden on the adult movie market.

Under these circumstances, where there is no restraining effect on the market, and no substantial deterrent effect on individual rights of free speech, the City's most important interest in regulating use of its property for commercial purposes is clearly sufficient to justify the zoning regulation here. We conclude the zoning regulation of location of adult movie theaters is a reasonable regulation of place for First Amendment speech which does not violate First Amendment freedoms. *See Young* at page 63. The different treatment accorded adult movie theaters as distinguished from other types of movie theaters is a different issue, which we discuss next.

## C. Classification Based on Content

The final objection made to the constitutionality of the zoning scheme is that it classifies theaters on the basis of the content of the films shown, and treats adult movie theaters differently from other theaters showing films protected by the First Amendment. This, appellants claim, violates both the First Amendment and equal protection guaranties.

The United States Supreme Court, considering this argument in *Young,* departed from traditional First Amendment jurisprudence and upheld both the classification of films based on sexually explicit content and the different treatment accorded the theaters showing them. The majority in *Young* did not reach agreement on a rationale for this result, but two elements appear to have been dispositive. We find those elements present here, and are persuaded the Seattle scheme does not deny or infringe on the rights of free speech and equal protection.

The first element is that the ordinance has only a slight and neutral effect on protected speech. No real restraint or deterrent effect is evident. The ordinance regulates only the place where these films can be shown. It demonstrates a reasonable decision that the public welfare is best served by having this particular type of speech take place only in certain areas of the community. The ordinance thus remains neutral regarding the content of the films—it neither approves nor disapproves of that content, and neither promotes nor inhibits exhibition of the films.[6]

The second element is the City's great interest in protecting and preserving the quality of its neighborhoods through effective land–use planning. The record demonstrates the City's sincere and sustained effort to enhance and improve the quality of life in Seattle. Zoning is an extremely important tool for achieving land–use goals in a municipality. *See Belle Terre v. Boraas,* 416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974). Thus, "the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Young, supra* at 71.

We emphasize that the purpose of the ordinance is not to regulate the content of speech. Contrary to the assertions of

---

[6]Four of the justices in *Young* reasoned that society has less interest in protecting sexually explicit expression than other types of protected speech. This reasoning is not essential to the result reached, and we do not adopt it as the basis for the result reached here. We note, moreover, that our decision is confined in its effect to regulation by zoning of sexually explicit speech in films under the particular circumstances of this case.

the appellants, the ordinance is not a disguised form of censorship. The record is replete with testimony regarding the effects of adult movie theater locations on residential neighborhoods. The evidence is more than adequate to support the finding below that the goal of the ordinance is to preserve the character and quality of residential life in the City.

The choice of methods for locating adult movie theaters, that is to concentrate them in the business areas of the City rather than disperse them (as did the Detroit ordinance), is not of constitutional significance. The City's planning effort must be accorded a sufficient degree of flexibility for experimentation and innovation. *Young, supra* at 71, 73. We cannot substitute our judgment of what would be the most effective method of regulation in this regard. It should also be noted that the majority in *Young* specifically approved the concentration method. *Young, supra* at 62, 71.

Nor do we find it significant that the Detroit ordinance upheld in *Young* had a provision allowing waiver of the ordinance restriction while the Seattle ordinance does not. Our conclusion that the City may regulate the location of adult movie theaters is not dependent in any way on the existence of possible waiver for existing theater locations. The Detroit waiver provision likewise played no part in the reasoning of the majority in *Young.* Nor is there any showing the appellants are constitutionally entitled to exemptions from the zoning restriction in this particular case. Appellants therefore fail to show any constitutional deficiency in this regard.

We conclude the City's paramount interest in protecting, preserving, and improving the character and quality of its residential neighborhoods is sufficient to justify this nondiscriminatory zoning regulation of the location of adult movie theaters.[7] We find no violation of First Amendment or equal protection guaranties.

---

[7]The City also asserts an interest in protecting children as a justification for the ordinance. This interest alone will not support a classification based on the content of speech. *Erznoznik v. Jacksonville,* 422 U.S. 205, 213, 45 L. Ed. 2d 125,

We therefore turn to the final issue presented, the constitutionality of the provision for termination of nonconforming uses within 90 days.

## II

Appellants contend the 90–day termination provision denies them equal protection in that no other nonconforming use must be terminated in such a short period, and denies them due process by creating an economic hardship outweighing the public benefit to be gained by termination.

 With regard to the equal protection argument, appellants fail to show they are similarly situated with other nonconforming users. This is particularly evident because the calculation of a reasonable termination period, as discussed below, depends on the facts and circumstances of the particular case. Since each case must be determined on its own merits, the equal protection analysis does not apply.

In *Seattle v. Martin,* 54 Wn.2d 541, 342 P.2d 602 (1959) this court recognized the power of a municipality to require termination of nonconforming uses within a reasonable period of time. We adopted a balancing test to determine the reasonableness of the termination period, that is, whether the harm or hardship to the user outweighs the benefit to the public to be gained from termination of the use. *Seattle v. Martin, supra* at 544. As pointed out above, this test is applied on a case–by–case basis, looking to the circumstances of each nonconforming user. Applying this test to each of the appellants here, we conclude the 90–day termination period is not unreasonable and does not deny appellants due process of law.

Northend Cinema, Inc., has the license to operate the Northend Theater. The evidence at trial showed the owner and lessor of the building is an officer of the corporation. The leasing arrangement is thus very informal and may be characterized as terminable at will or on short notice by the

---

95 S. Ct. 2268 (1975). We recognize, however, that the particular needs of children are a significant element in determining the quality of urban residential neighborhoods.

parties. Therefore, Northend is not bound by any lease obligation to remain at its present location. Nor is it bound by its lease or its license to show adult films as opposed to any other type of film. Furthermore, whatever costs it has expended for improvements to the building or necessary equipment have either been completely recovered through depreciation or were contemplated to be left as property of the lessor.

Gaiety Theaters, Inc., operator of the Ridgemont Theater, is similarly situated. Its lease is the individual obligation of its president, and does not bind the corporation to remain at its present location. It is not bound by its lease or its license to show adult films. Furthermore, it has expended no funds on physical improvements.

Apple Theater, Inc., is the lessee and operator of the Apple Theater. Apple entered into a new 3–year lease just prior to adoption of the ordinance, and while public hearings were being held on the proposal. It is not obligated by its lease, or by its license, to show adult films. Furthermore, all costs it has expended in improvements to the building or necessary equipment have either been recovered through depreciation or were contemplated to be left as property of the lessor.

In the face of these facts, the court below found appellants had not come forward with any clear evidence of economic harm. The main thrust of their objection, that simply having to move to another location or show a different type of film is substantial economic harm, is unsupported by any clear evidence. The court had a right to conclude that appellants' allegations they will suffer economic harm were speculative at best. The record thus supports the finding of the court below that Northend and Gaiety will incur no economic damage, and Apple will incur no clear economic damage, by enforcement of the ordinance.

The public benefit to be gained by termination, we have said, is a step toward controlling deterioration of city

neighborhoods, and toward productive land–use planning. This benefit is well supported by the record.

We conclude the benefit to the public through termination of these uses within 90 days outweighs the harm appellants will sustain thereby. The termination period is reasonable, and appellants have suffered no violation of due process.

We are mindful that this ordinance was passed in 1976. A temporary injunction against enforcement of the zoning restrictions pending this appeal has allowed appellants to continue normal business operations in the intervening months. Much more than 90 days' time has elapsed. Appellants have therefore had more than ample time to prepare for the contingency of having to terminate their present adult movie theater use.

The temporary injunction is dissolved and the judgment below is affirmed.

WRIGHT, C.J., ROSELLINI, STAFFORD, UTTER, BRACHTEN-BACH, DOLLIVER, and HICKS, JJ., and PRICE, J. Pro Tem., concur.

Reconsideration denied December 14, 1978.