55 P.3d 673 (2002)
STATE of Washington, Respondent,
v.
E.J.Y., Dob: 4/21/87, Appellant.
No. 48674-8-I.
Court of Appeals of Washington, Division 1.
October 14, 2002.
*675 George Yeannakis, Betsy Hollingsworth, Jason McGill, Seattle, WA, for Appellant.
Stephen Hobbs, Seattle, WA, for Respondent.
*674 BAKER, J.
E.J.Y. was adjudicated guilty in juvenile court of felony harassment based on threatening statements he made to a school employee. E.J.Y.'s principal argument on appeal is that the criminal harassment statute, RCW 9A.46.020, is unconstitutionally overbroad and vague under both the federal and state constitutions. We disagree because the statute as written proscribes only true threats, which are unprotected speech. E.J.Y. also argues that he was unconstitutionally restrained during trial. Because this was a bench trial, there was no risk of juror prejudice from viewing the restraints. Thus, even though the record does not contain the required factual showing to support the use of restraints, we conclude that the error was harmless, and affirm.

I
Fourteen-year-old E.J.Y. attended middle school. He was placed in a special education services classroom for the first two periods of his school day because of his learning and behavioral disabilities. One morning, the school was administering standardized tests. Because he was not participating in the tests, he was required to return to the special education class for his third period. This upset him and he left the class to complain to the school counselor, Darin Greer. He told Greer that he was not going to return to class and would rather go home.
E.J.Y. then left Greer's office and walked down the hall toward the main office where he came into contact with Ezella Rosier, an attendance specialist. When he was about five feet away from her she heard him say, "I think I should go get my gun and do like Columbine...." Rosier told E.J.Y., "I heard what [you] said [and] you should not be saying those kinds of things." Greer then approached the two and heard E.J.Y. chanting Columbine, "Columbine, Columbine." E.J.Y. then said, "You're going to have another Columbine around here, you guys better watch out. It's not just white boys that go off, I might do it, too."
E.J.Y. then left the office area and Greer followed him until he left the school grounds. Later, Greer wrote a report of the incident and gave it to the vice-principal. Rosier followed with a written report of her own.
E.J.Y. was subsequently charged with the offense of felony harassment in violation of RCW 9A.46.020. When the case was called, E.J.Y.'s defense counsel raised an issue before the court regarding the fact that E.J.Y. was being held in restraints, both leg and arm shackles. The trial judge then called upon two detention officers to give unsworn testimony as to the reason E.J.Y. had been brought to court in shackles. They explained to the court that an incident had occurred approximately three weeks earlier when E.J.Y. was being returned from a school program. In that incident E.J.Y. had bitten a staff person and attempted to escape out of a car.
Upon hearing the concerns expressed by the staff, the trial judge indicated that she could not substitute her judgment for that of the security officer. The judge did order removal of the leg restraints but not the arm restraints, and expressly informed defense counsel that if needed, extra time would be provided for attorney-client communication.
At the fact finding hearing, both Greer and Rosier testified that the statements made by E.J.Y. frightened them. E.J.Y. was subsequently *676 found guilty as charged and received a standard range sentence. He now appeals.

II
E.J.Y. contends that the criminal harassment statute violates both the First Amendment and article I, section 5 of the state constitution because it proscribes protected speech. We begin by addressing E.J.Y's argument that the Washington Constitution provides greater protection than the First Amendment for threatening speech.
In State v. Gunwall,[1] the Washington Supreme Court enumerated several nonexclusive criteria which a court should consider to determine whether it is appropriate to resort to the Washington Constitution for separate and independent state grounds of decision.[2] The same factors have been analyzed to determine whether the state constitution ultimately provides greater protection than its corresponding federal provision.[3] As noted in State v. Reece,[4] "[t]he question to be asked here is not whether the concept of free speech is interpreted more broadly under the state constitution than under the federal constitution. This court has already answered this question in the affirmative."[5] Instead, the inquiry must focus on the specific context in which the state constitutional challenge is raised. Even where a state constitutional provision has been subject to independent interpretation and found to be more protective in a particular context, it does not follow that greater protection is provided in all contexts.[6]
The first factor to consider in the Gunwall inquiry is the text of the state constitution. Article I, section 5 reads, "Freedom of Speech. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The text of the First Amendment reads. "Congress shall make no law ... abridging the freedom of speech...." Because of its broad language, article I, section 5 has been interpreted to offer greater protection than the First Amendment in the context of pure noncommercial speech in a traditional public forum.[7] Additionally, unlike its federal counterpart, article I, section 5 more strictly prohibits prior restraints on free speech.[8] But the second clause of article I, section 5 makes clear that freedom of speech may be abused and that each person may be held accountable for abusing that right.
The second factor to consider is the difference in the texts of the federal and state constitutions. A comparison of the language in the First Amendment and article I, section 5 does not dictate adoption of a more protective state doctrine for determining overbreadth.[9]
The third factor to consider is constitutional history. The State Constitutional Convention adopted the most protective of three proposed free speech provisions. But this fact does not shed light on whether the drafters intended more protection in the context of threatening speech.[10]
The fourth factor in a Gunwall analysis is preexisting state law. "State cases and statutes from the time of the constitution's ratification, rather than recent case law, are more persuasive in determining whether the state *677 constitution gives enhanced protection in a particular area."[11] The Washington Code of 1881, section 822 specifically criminalized verbal or written communication that threatens injury to person or property with the intent to extort money. Section 909 criminalized threats when used to intimidate electors. Further, section 1230 of the Code criminalized libel, and section 6294 made it a crime to make false statements about candidates running for office. Shortly after statehood, laws were passed which criminalized threats to publish libel,[12] to slander a woman,[13] to threaten or intimidate a public officer,[14] and to provoke assault by word, sign or gesture.[15] A review of our preexisting state laws does not justify greater protection for threatening speech.
The fifth Gunwall factor to consider is the structural difference between the federal and state constitutions. The federal constitution is a grant of enumerated powers, while the state constitution acts as a limitation on the otherwise plenary powers of state government.[16] This distinction simply reinforces this court's responsibility to engage in independent state analysis and afford broader protection when necessary.[17]
The sixth factor is whether this case raises a matter of particular state or local concern. This factor typically favors an independent state analysis.[18]
E.J.Y. fails to show that article I, section 5 of the state constitution warrants greater protection than the federal constitution in the context of threatening speech. Therefore, we will evaluate E.J.Y.'s claims of overbreadth by applying federal constitutional law.
The constitutionality of a statute is an issue of law and must always be reviewed de novo.[19] A law is overbroad if it sweeps within its prohibitions constitutionally protected free speech activities.[20] Under First Amendment overbreadth doctrine, a law may be invalidated on its face only if the law is "substantially overbroad."[21] In determining overbreadth, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct."[22]
RCW 9A.46.020(1) defines criminal harassment as follows:
(1) A person is guilty of harassment if:
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; ... and
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out....
RCW 9A.04.110(25) defines "threat" as a "means to communicate, directly or indirectly the intent: (a) to cause bodily injury in the future to the person threatened or to any other person[.]" On its face, this statute criminalizes a form of pure speech: threats.[23]
*678 But the United States Supreme Court has long held that certain classes of speech may be constitutionally unprotected.[24] These certain classes of speech include lewd and obscene speech, profane speech, libelous speech, and "fighting words."[25] Such speech is unprotected because its slight social value is clearly outweighed by the social interest in order and morality.[26]
The State argues that the criminal harassment statute is not overbroad because it proscribes only "true threats," which are likewise constitutionally unprotected.[27] E.J.Y. counters that while "true threats" are not protected speech, a proper definition of "true threats" requires that the threat incite immediate fear, which the criminal harassment statute's definition of "threat" lacks. We disagree. The definition E.J.Y. urges would improperly conflate "true threats" and "fighting words." "Fighting words" are words that by their very utterance inflict injury, tend to incite an immediate breach of the peace, or are inherently likely to provoke a violent reaction.[28] In State v. Williams, our Washington Supreme Court defined "true threat" as "a statement made `in a context in or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted ... as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual].'"[29] This definition was recently addressed in State v. J.M.[30] where the court noted, "We recognize that several definitions of "`true threat'" may be found in federal decisions, but find that the definition in Khorrami, which we adopted in Williams, best reflects the First Amendment considerations at issue where a threat is concerned."[31] Neither Williams nor J.M. leave room in the definition of "true threat" for the addition of an element of immediacy.[32] Because the criminal harassment statute proscribes only "true threats" as defined in Williams and J.M., which are unprotected speech, the statute is not overbroad under the First Amendment.
E.J.Y also argues that our recent decision in State v. Pauling,[33] which held that the extortion statute, RCW 9A.56.130, was unconstitutionally overbroad,[34] should be applied to the criminal harassment statute, therefore rendering it unconstitutional. Pauling is distinguishable. In that case we concluded that extortion requires that any threat be unlawfully made, and because the statute did not contain an unlawfulness element, the statute necessarily restricted protected speech and was therefore overbroad.[35] But the criminal harassment statute at issue here has such an element. It states that a *679 person is guilty of harassment only if, "[w]ithout lawful authority" he knowingly threatens another person.[36]
E.J.Y. next argues that the criminal harassment statute is void for vagueness under the greater due process protection of article I, section 3. This argument ignores precedent to the contrary. As noted in In the Matter of the Personal Restraint Petition of Dyer,[37] "Washington's due process clause does not afford a broader due process protection than the Fourteenth Amendment."[38]
We next consider whether E.J.Y. was denied a fair trial when he was held in restraints throughout his fact finding hearing. A criminal defendant is "entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances."[39] "Restraints are viewed with disfavor because they may abridge important constitutional rights...."[40] In cases involving potential misconduct by a criminal defendant, the "trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record."[41]
The State concedes that the required showing on the record was not made. But this error does not require reversal unless it is shown that the use of restraints substantially affected the trial court's fact finding.[42] No such showing has been made. This was a proceeding without a jury, which greatly reduces the likelihood of prejudice. We conclude that the error was harmless.
E.J.Y next argues that the court ignored the element of "knowingly threatens" in RCW 9A.46.020. He is incorrect. The trial court was aware that a determination had to be made as to whether E.J.Y. actually, knowingly communicated a threat: "There is no question for this court that [E.J.Y] said [this threat] and directed it at [Greer and Rosier]." Nor was "there a question as to what his intent was." The court adequately addressed the element of E.J.Y.'s subjective intent.
Finally we consider whether the State failed to prove that E.J.Y.'s words or conduct placed Greer and Rosier in reasonable fear. In a juvenile proceeding, as in an adult case, the evidence is sufficient to support an adjudication of guilt if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find all the essential elements of the crime charged beyond a reasonable doubt.[43] A claim of insufficiency "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."[44] The reviewing court must defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence.[45]
RCW 9A.46.020(1)(b) requires that the defendant by "words or conduct places the person threatened in reasonable fear that the threat will be carried out." The person threatened must subjectively feel fear and that fear must be reasonable. "Assuming the evidence established the victim's subjective fear, the issue is whether a rational trier of fact, viewing the evidence in the light most *680 favorable to the State, could have found beyond a reasonable doubt, using an objective standard, that the victim's fear ... was reasonable."[46]
E.J.Y. told Greer, "You're going to have another Columbine around here, you guys better watch out. It's not just the white boys that go off, I might do it, too." Greer testified that "I was concerned that [E.J.Y.] was making a threat that he could come back in and cause violence whether he was going to come back and shoot up the place...." Viewing the evidence in the light most favorable to the State, this is sufficient for a rational trier of fact to find that Greer was subjectively afraid. The same is true for Rosier who testified that she felt "a little frightened" because she had heard reports about a shooting in California in which a student had been making references to the Columbine shooting incident prior to the assault. She also testified that because of E.J.Y.'s facial expression, she felt he was upset and believed E.J.Y had meant what he said. Again, this is sufficient for a rational trier of fact to find that Rosier was subjectively afraid.
E.J.Y. counters that because Greer did not inhibit the juvenile's action after the statements, Greer's fear was not reasonable. Similarly, he argues that Rosier's fear was not reasonable because she waited before filling out a formal report. But the statute does not require immediacy. And the court found that "[t]here could be nothing clearer to this court that both Ms. Rosier and Mr. Greer were concerned about the statements... his behavior was that of an angry person...." The court concluded that "when those words were uttered they had the intended effect, that that was to create a reasonable fear that these threats could be carried out...." The court in making these findings relied upon the words of E.J.Y., the victims' personal knowledge of E.J.Y., the victims' awareness of other incidents of school violence, and the actions of the victims' after hearing the threat. Accordingly, the court's findings are supported by the evidence.
AFFIRMED.
AGID, J., and SCHINDLER, J., concur.
NOTES
[1] 106 Wash.2d 54, 720 P.2d 808 (1986).
[2] Gunwall, 106 Wash.2d at 58, 720 P.2d 808.
[3] State v. Boland, 115 Wash.2d 571, 575, 800 P.2d 1112 (1990).
[4] 110 Wash.2d 766, 757 P.2d 947 (1988).
[5] Reece, 110 Wash.2d at 778, 757 P.2d 947.
[6] Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 115, 937 P.2d 154 (1997), 943 P.2d 1358 (1997).
[7] Ino Ino, Inc., 132 Wash.2d at 118, 937 P.2d 154.
[8] Ino Ino, Inc., 132 Wash.2d at 117, 937 P.2d 154.
[9] Ino Ino, Inc., 132 Wash.2d at 119, 937 P.2d 154 (citing State v. Talley, 122 Wash.2d 192, 209, 858 P.2d 217 (1993)) (stating that Washington courts apply a federal analysis to claims of overbroad restrictions on speech).
[10] Ino Ino, Inc., 132 Wash.2d at 120, 937 P.2d 154 (concluding that in the obscenity context, this fact did not shed light on whether the drafter's intended more protection in the obscenity context).
[11] Ino Ino, Inc., 132 Wash.2d at 120, 937 P.2d 154.
[12] Rem.Rev.Stat. § 2432 (1909).
[13] Rem.Rev.Stat. § 2433 (1909).
[14] Rem.Rev.Stat. § 2368 (1909).
[15] Rem.Rev.Stat. § 2417 (1909).
[16] Ino Ino, Inc., 132 Wash.2d at 121, 937 P.2d 154.
[17] Ino Ino, Inc., 132 Wash.2d at 121, 937 P.2d 154.
[18] Ino Ino, Inc., 132 Wash.2d at 122, 937 P.2d 154.
[19] Ino Ino, Inc., 132 Wash.2d at 114, 937 P.2d 154.
[20] Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); City of Seattle v. Eze, 111 Wash.2d 22, 31, 759 P.2d 366 (1988).
[21] City of Houston v. Hill, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (citing New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)).
[22] Hill, 482 U.S. at 458, 107 S.Ct. 2502 (quoting Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)).
[23] State v. Williams, 144 Wash.2d 197, 206, 26 P.3d 890 (2001).
[24] Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
[25] Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766.
[26] Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766.
[27] In State v. Williams the court invalidated a portion of the criminal harassment statute. But in describing the portion of the statute challenged here, the court stated that the "statute clearly prohibits true threats[.]" Williams, 144 Wash.2d at 208, 26 P.3d 890.
[28] State v. Reyes, 104 Wash.2d 35, 40-41, 700 P.2d 1155 (1985).
[29] Williams, 144 Wash.2d at 207-08, 26 P.3d 890 (quoting State v. Knowles, 91 Wash.App. 367, 373, 957 P.2d 797 (1998)). See also U.S. v. Khorrami, 895 F.2d 1186, 1192 (7th Cir.), (cert. denied, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990)).
[30] 144 Wash.2d 472, 28 P.3d 720 (2001).
[31] J.M., 144 Wash.2d at 479 n. 4, 28 P.3d 720.
[32] Nor do we find E.J.Y.'s supplemental authority, Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 290 F.3d 1058 (9th Cir.2002), persuasive. While that case did cite to a definition of true threat from the 2nd Circuit which did contain an element of immediacy, the 9th Circuit's definition does not contain that element, "a true threat is: a statement which, in the entire context and under all the circumstances, a reasonable person would foresee would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person." Am. Coalition of Life Activists, 290 F.3d at 1077.
[33] 108 Wash.App. 445, 31 P.3d 47, review granted, 146 Wash.2d 1001, 45 P.3d 551 (2002).
[34] Pauling, 108 Wash.App. at 448, 31 P.3d 47.
[35] Pauling, 108 Wash.App. at 448-51, 31 P.3d 47.
[36] RCW 9A.46.020(1)(a).
[37] 143 Wash.2d 384, 20 P.3d 907 (2001).
[38] Dyer, 143 Wash.2d at 394, 20 P.3d 907. See also State v. Ortiz, 119 Wash.2d 294, 831 P.2d 1060 (1992); State v. Wittenbarger, 124 Wash.2d 467, 880 P.2d 517 (1994); In the Matter of the Personal Restraint Petition of Matteson, 142 Wash.2d 298, 12 P.3d 585 (2000).
[39] State v. Turner, 143 Wash.2d 715, 725, 23 P.3d 499 (2001) (quoting State v. Finch, 137 Wash.2d 792, 842, 975 P.2d 967 (1999)).
[40] State v. Hartzog, 96 Wash.2d 383, 398, 635 P.2d 694 (1981).
[41] Hartzog, 96 Wash.2d at 400, 635 P.2d 694.
[42] State v. Hutchinson, 135 Wash.2d 863, 888, 959 P.2d 1061 (1998), cert. denied, 525 U.S. 1157, 119 S.Ct. 1065, 143 L.Ed.2d 69 (1999).
[43] State v. Avila, 102 Wash.App. 882, 895-96, 10 P.3d 486 (2000), review denied, 143 Wash.2d 1009, 21 P.3d 290 (2001).
[44] State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992).
[45] State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533 (1992).
[46] State v. Alvarez, 74 Wash.App. 250, 260-61, 872 P.2d 1123 (1994), aff'd, 128 Wash.2d 1, 904 P.2d 754 (1995).